UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- X

JAMES FRASCATORE,                                    **COMPLAINT**

                Plaintiff,                     **17 Civ.**

      - against -                            **ECF Case**

JAMES BLAKE;                                          **Jury Trial Demanded**
HARPERCOLLINS PUBLISHERS L.L.C.,
TRACY CATAPANO-FOX;
THE CITY OF NEW YORK;
THE NEW YORK CITY POLICE DEPARTMENT;
THE NEW YORK CITY CIVILIAN COMPLAINT
REVIEW BOARD; and CCRB Employees JOHN DOE #1-5
(whose identities are unknown but who are known to be
investigators and/or supervisory personnel of the Civilian
Complaint Review Board),
in their individual and official capacities,

                Defendants,

------------------------------------------------------------------------- X

      Plaintiff, JAMES FRASCATORE, by and through his attorneys, BRILL LEGAL

GROUP, P.C., complains of the defendants as follows:

<u>**PRELIMINARY STATEMENT**</u>

      1.     This defamation, civil rights and employment discrimination action is brought in

response to the wholesale failure of the New York City Civilian Complaint Review Board

("CCRB") to protect Plaintiff's confidential personnel records, leading to the deprivation of

Plaintiff's procedural and substantive due process rights by Defendants CCRB and New York

City Police Department ("NYPD") during the NYPD's internal disciplinary process. This

deprivation of rights stems from a years-long pattern of blatantly false and defamatory

statements made by Defendant James Blake ("Blake") and the NYPD following Blake's

mistaken and bried detention by Plaintiff during a serious police investigation.

2.      Between December, 2014 and the present, Plaintiff's good name and reputation were repeatedly smeared in the press following the CCRB's unauthorized release of his private personnel information, a violation of New York state civil rights law for which no one has been held accountable. Plaintiff's name was again dragged through the mud following his encounter with Defendant Blake, who repeatedly and incessantly claimed he was the target of racial profiling by Plaintiff when he was tackled and briefly detained after he was mistakenly identified by a civilian witness as the ringleader of a criminal organization. Despite apologies from Plaintiff and his multiple supervisors, Blake continues to this day to paint Plaintiff as an out of control and corrupt officer who has no business being a member of the NYPD. Due to his celebrity, these statements have had a far greater reach than the complaints of an average New Yorker. Indeed, Defendant Blake has recently embarked on a worldwide press junket to promote his new book, the foreword of which perpetuates his false statements. Throughout that book and his many, many media appearances throughout the world, Blake has libeled, slandered and defamed Plaintiff by perpetrating a false account of Plaintiff's actions.

3.      Top NYPD supervisors, including the Police Commissioner, also rushed to blame Plaintiff for the failures of his superiors and what amounted to an unfortunate mistake. They actively avoided opportunities to set the record straight with the media and offered no defense of their own dedicated officer, leaving Plaintiff to hold the bag for the entire incident.

4.      Adding insult to injury, during the same time period, i.e. 2014-Present, the CCRB has been given a more integral role in the NYPD internal disciplinary process, fielding its own employees as "prosecutors" of alleged police misconduct in the NYPD Trial Room, which recommends appropriate discipline to the Police Commissioner. It is the Police Commissioner, however, who appoints the Deputy Commissioner – Trials who acts as judge and makes

disciplinary recommendations. Plaintiff's mistaken arrest of Blake is the subject of an ongoing internal NYPD disciplinary process, prosecuted by CCRB employees. CCRB's illegal dissemination of Plaintiff's personnel file and Blake's false statements have tainted the disciplinary process to the point that his private personnel matter has played out primarily in the court of public opinion, perpetuating the false narrative to Plaintiff's long-term detriment.

5.      Given the public and political nature of the illegal release of information, along with its dissemination both before and after the encounter with Blake, along with the fact that New York City ("the City") settled Blake's claim against Plaintiff and the NYPD by setting up a CCRB fellowship in his name, among other concessions, Plaintiff has been cast as a racist and a goon. Though this characterization could not be farther from the truth, this public perception has not only led to his family fleeing their home in fear as a result of public threats to their safety, it has ruined a good man's career, name and reputation. Even if he only stands to lose vacation time as a result of the disciplinary process, he faces a significant diminution in his long-term prospects for better assignments, promotions and recognition for his dedication to the public through his chosen career as a police officer. In portraying Plaintiff as a racist during this process, two New York City agencies (the CCRB and, through the Trial Room process, the NYPD) have intentionally discriminated against Plaintiff on the basis of race.

6.      Plaintiff seeks relief for the Defendants' violations of his rights as secured by the Civil Rights Act, 42 U.S.C §§ 1981 and 1983, and his rights secured by the Fourth and Fourteenth Amendments to the Constitution of the United States, and the laws of the State of New York. The illegal dissemination of confidential information by CCRB staff members corrupted the NYPD disciplinary process and has deprived Plaintiff of his constitutional right to due process of law. Plaintiff has been cast by the Defendants as a white police officer who

engaged in racial profiling or, just as often, a racist. As that bell can never be unrung, Plaintiff's ability to defend himself against Defendants' baseless accusations has been severely impaired and Plaintiff's reputation and good name have been irreversibly sullied throughout the world.

## JURISDICTION AND VENUE

7.      This action is brought pursuant to 42 U.S.C. §§ 1981, 1983 and 1988, and the Fourth and Fourteenth Amendments to the Constitution of the United States.  Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and (a)(4) and the aforementioned statutory and constitutional provisions.

8.      Plaintiff further invoke this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all State law claims for relief which derives from the same nucleus of operative facts and are part of the same cause or controversy that give rise to the federally based claims for relief.

9.      Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(a), (b) and (c).

## JURY DEMAND

10.     Plaintiff demands a trial by jury in this action on each and every one of his claims.

## PARTIES

11.     Plaintiff is a white resident of Nassau County in the State of New York.

12.     Defendant JAMES BLAKE is an African-American author, media personality and former professional tennis player. He is a resident of San Diego County in the State of California.

13.     Defendant HARPERCOLLINS PUBLISHERS L.L.C., is a Limited Liability Company, formed in Delaware. It published Blake's book "Ways of Grace".

14.     Defendant TRACY CATAPANO-FOX was, at all relevant times, Executive Director of the CCRB, departing that position in October, 2014.

15.     Defendants CCRB Employees JOHN DOE #1-5 ("John Does") are and/or were at all times relevant herein, officers, employees, and agents of the CCRB, a municipal agency of the City whose board members are appointed by the Mayor. John Does are being sued in their individual and official capacities.

16.     At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees, and officers of the CCRB, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties.  They were acting for and on behalf of the CCRB at all relevant times, with the power and authority vested in them as officers, agents and employees of the CCRB and incidental to the lawful pursuit of their duties as officers, employees and agents of the CCRB.

17.     Defendants NYPD and CCRB are municipal agencies of the City of New York.

18.     Defendant City of New York is a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain the CCRB, and provides it with funding and oversight. Defendant City of New York is also authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant City of New York assumes the risks incidental to the maintenance of the CCRB and a police force and the employment of CCRB investigators and police officers as said risks attach to the public consumers of the services provided by the CCRB and NYPD.

## STATEMENT OF FACTS

19.     In December, 2014, WNYC Radio broadcasted and published a series of stories with information obtained, in part, from attorneys whose clients had complaints pending against Plaintiff at the CCRB. Those stories alleged, in summary, that Plaintiff was a problem police officer with an inordinate number of CCRB complaints and a troubling pattern of misconduct. It was later determined that Plaintiff's confidential personnel records, protected under New York Civil Rights Law §50-a, had been illegally released to those attorneys by, among others, former CCRB Executive Director TRACY CATAPANO-FOX.

20.     On September 9, 2015, Plaintiff was assigned to the NYPD's Financial Crimes Task Force, where he was working towards a promotion to Detective. On that day, he was assisting in an investigation into a fraud complaint by the company GoButler. GoButler was a tech startup whose business model included a service offering on-demand delivery of practically anything to its users by courier. GoButler had become the victim of a sophisticated ring of fraudsters who would use stolen identities and credit card information to order high-end items via GoButler and have its couriers deliver the items to them at hotels. The perpetrators would intercept the couriers in front of the hotels, where they would make a quick getaway with the merchandise before the fraud was discovered.

21.     On September 9, 2015, the perpetrators had ordered items through GoButler and had arranged delivery to the Grand Hyatt New York on 42nd Street in Manhattan. GoButler employees had suspected the order in question to be fraudulent and arranged with Financial Crimes Task Force Detectives, one of whom was supervising Plaintiff, to use the delivery as a ruse to intercept and arrest the perpetrators. Plaintiff was chosen by his NYPD superiors to make the "delivery" and was provided photos of the target subjects.

22.     During a briefing before the operation, Plaintiff was provided with photos of the individuals alleged to be part of the fraud ring, as identified by GoButler employees. One photo provided to Plaintiff depicted the alleged ringleader of the fraud ring. That photo portrayed a man bearing a striking resemblance to the way Defendant Blake appeared that day. During that same briefing, Plaintiff was provided with written information that, based upon prior interactions, the individuals might be armed with knives. He was also instructed by his superiors that the ringleader was to be taken into custody immediately.

23.     When Plaintiff arrived at the Grand Hyatt, an individual matching the description and picture of the ringleader was standing outside, exactly as the GoButler employees indicated he would be. In keeping with his instructions and NYPD protocol in potentially dangerous situations, Plaintiff quickly ran up to the subject, very quickly identified himself as a police officer and placed his hands on the subject. In response, Plaintiff observed the individual pulling away from him. Wishing to avoid a potentially dangerous foot pursuit or violent confrontation, Plaintiff effectuated a quick takedown and arrest.

24.     The individual then began acting in a way that was inconsistent with who Plaintiff had believed him to be, saying things like, "Officer I am complying," and "Officer I am putting my hands behind my back and complying." The Detectives in charge of the operation arrived on the scene and fairly quickly determined they had the wrong man, identifying him now as Defendant Blake.

25.     Blake was in handcuffs for approximately 10 minutes before he was released. Plaintiff, along with the Detectives in charge of the operation, personally apologized to Blake and explained the mistaken identification. At the conclusion of the encounter, Blake and Plaintiff shook hands and patted each other on the back. All seemed forgiven.

26.     The day was not completely fruitless, however. Plaintiff entered the Grand Hyatt, identified and apprehended another member of the fraud ring.

27.     Despite later accusations to the contrary, neither Plaintiff nor his superiors made any effort to conceal or cover up Blake's brief detention. A "voided arrest" was entered into the NYPD database and an email was also generated by a Detective and sent to all supervisors.

28.     The recriminations for mistakenly arresting a celebrity started immediately, however. Despite there being no misconduct, NYPD originally suspended all officers involved that day. By midnight, no officers were suspended. Plaintiff was placed on modified assignment, as directed by the Police Commissioner.

29.     In the days following the incident, Police Commissioner Bratton and other unnamed high-ranking members of the NYPD criticized Plaintiff not for his tactics, but for his perceived lack of manners and alleged failure to advise superiors of a celebrity-involved incident. For example, on September 11, 2015, Bratton told the New York Daily News that the NYPD had learned of the incident from Blake's comments to the press, which was patently false. Other NYPD sources told the Daily News that Plaintiff should have "voided the arrest, make notifications and say 'I'm sorry'" (which is exactly what he did), while the Daily News and New York Post referenced the leaked CCRB information about Plaintiff's prior complaints, leading to coverage like this:



Sadly, the NYPD was in possession of security video that showed Plaintiff speaking to

Blake and the two shaking hands, but did not release that evidence to the press, reinforcing the

public perception that Plaintiff had never apologized for his actions.

30.     Blake retained counsel and was provided with the full surveillance video of the event by the NYPD within two days. He spoke to Good Morning America on the morning of September 10, the day after the incident, which was quoted in a New York Post article first published online on September 10. According to the Good Morning America transcript of the interview and the Post article, he had the following conversation with host Robin Roberts:

ROBERTS: "This was a case of excessive force, you're not making it about racial profiling?"

BLAKE: "No."

ROBERTS: "You just feel it was use of excessive force?"

BLAKE: "Yeah."

31.     One day later, however, in the September 11, 2015 Daily News article, Blake made a statement that he has repeated far less tentatively on many separate occasions since, indicating he believed there was "probably a race factor involved." To repeat, this was one day after he made a public statement on national television to the contrary.

32.     Also on September 11, 2015, WPIX-11 News broadcast a story which distributed details of pending CCRB complaints against Plaintiff, details which could only have come from a breach of New York Civil Rights Law by the CCRB.

33.     Around the same time period, Blake also told multiple news outlets, including People magazine in a September 12, 2015 story, that Plaintiff never identified himself, despite his statements to Plaintiff at the time that clearly showed he was aware Plaintiff was a police officer.

34.     A few weeks after the incident, the NYPD had yet to come to Plaintiff's defense and had yet to release the full video of the incident to the public, despite Plaintiff facing a barrage of worldwide negative media attention, including death threats. Plaintiff requested and received a copy of the full video through official NYPD channels due to his concern that it would be suppressed or erased by the NYPD, as it ran counter to the narrative the Mayor and Police Commissioner were feeding the press. Plaintiff showed the video to his family, which increased their frustration as to why the City was allowing a false narrative of the events to remain in the public eye for weeks. Out of a mistaken sense that good would come from it, a member of Plaintiff's family, without his knowledge or permission, provided that video to the New York Post. In a September 25, 2015 article, The Post reported the contents of the suppressed video as follows:

"The undercover officer [Plaintiff] extends his hand to Blake, and the former athlete shakes it. Frascatore also pats Blake on the shoulder a few times.

The cop and other officers in the sting-gone-awry then start to walk away from the scene outside the Grand Hyatt hotel in Midtown, where Frascatore body-slammed Blake to the sidewalk minutes earlier in a case of mistaken identity.

Blake follows the officers and pats lead Detective Daniel Herzog on the arm. The ex-tennis star then engages in another chat with Frascatore."

35.     While Plaintiff was finally revealed not to be the thug and racist portrayed by Defendants, Defendants still failed to adjust their false narrative. Instead, after the Post article was published, Internal Affairs Bureau (IAB) officers were assigned to investigate how the video was released. An inspector from IAB went to Plaintiff's office and physically took the disc from him. Plaintiff's supervisors then ordered him to pack his locker and no longer report to the Financial Crimes Task Force Office. Instead, despite the fact that no evidence of actual misconduct had been found and no disciplinary charges filed, Plaintiff was reassigned to the

109th Precinct Annex in Queens, his overtime was drastically cut and he was scheduled so that he couldn't even earn the extra 13 minutes a day he received from so-called "chart time". He was also restricted to duty inside the precinct and was specifically ordered not to conduct investigations that involved public contact. In addition, he was placed on "Level 1 Force Monitoring," a higher level of supervision that generally last one year or less. In Plaintiff's case, he had yet to be removed.

36.     For months following the incident, Plaintiff continued to receive numerous death threats to him and his family, which required the intervention of the NYPD Threat Assessment Unit. Nassau County Police installed cameras and a panic button in Plaintiff's home. case of any threat(s). Plaintiff's young children had to be escorted onto their school bus and were terrified to leave the house. Needless to say, Plaintiff's marriage was also extraordinarily strained and affected in many ways, as was his own emotional well-being.

### Blake's and HarperCollins' Defamation of Plaintiff

37.     Following the incident, Blake wrote a book with Carol Taylor entitled "Ways of Grace". It details stories of athletes who spurred social change. The book was released on June 27, 2017. Upon information and belief, it was not a coincidence that the release date was scheduled in close proximity to when Blake was expected to testify against Plaintiff in an NYPD disciplinary proceeding. It was also unlikely to have been a coincidence that Blake was in the final stages of negotiations with the City to settle his claims stemming from the minutes-long incident with Plaintiff, as both would help with book publicity. Despite suffering no physical injury, Blake ultimately settled that claim for $171,920.50 on July 27, 2017 and released the City and its employees from liability.

38.     Blake sells his story as an encounter with a racist police officer, offering personal inscriptions of his book on his own website with the following description of how he has "faced racism firsthand—publicly –first at the U.S. Open and then in front of his hotel on a busy Manhattan street, where he was tackled and handcuffed by a police officer in a case of "mistaken identity":



39.     Blake tells his personal story of adversity and activism in the book's foreword. He describes his encounter with Plaintiff beginning when he, ironically, mistakenly identified Plaintiff as an old high school friend. Instead, "When he reached me he picked me up and slammed me to the ground." He writes that the only officer who apologized to him was an older man who arrived on the scene later, noting "The officer who tackled me, whose last name I later found out is Frascatore, never did," in direct contradiction of the video evidence.

40.     Blake continues, "Although the officers on the scene admitted that something had occurred, their version of the events was very different from mine. They claimed I was detained for less than a minute, was not manhandled, and that I was never in handcuffs. I couldn't believe it, but it was the word of five officers against mine." These statements are belied by the paperwork filed by the officers, including the voided arrest form and email sent to supervisors on the day of the incident that do not reflect what Blake claims is their statement. Blake then claims that, as a result of his going to the press, the officers' statement changed to what "was now a lot closer to what had actually occurred," which has no basis in fact.

41.     Blake writes, "Officer Frascatore did not identify himself as a member of law enforcement, ask me my name, read me my rights, *or in any way afford me the dignity and respect due every person who walks the streets of this country*." [Emphasis added.] This, as Blake knew, was a wholesale falsehood. Plaintiff did all he could to remedy his mistake in the moments after he realized it. He was respectful, apologetic and humble with Mr. Blake. But since the portion of the video showing Plaintiff's actions never got a fair public airing, Blake feels justified in ignoring it in order to further his own narrative of victimization.

42.     Blake goes on to make reference to the illegally-released CCRB complaints. While failing to note that Plaintiff had been cleared of the allegations, he maliciously asserts that Plaintiff must have repeatedly lied about other cases where he used excessive force and covered it up: "You have to wonder if those three reports are really forty, or a hundred, because he had not reported them in the same way he had not reported mine." Of course, Plaintiff reported Blake's immediately, and accurately.

43.     Three paragraphs later, in the same foreword, never having shifted his focus from Plaintiff, Blake posits this thought: "It is important to understand that racism never went away, nor racial profiling, nor unconstitutional practices that target specific demographics, the use of excessive force by police, and a lack of accountability. I don't think racism and discrimination will ever go away until we create change in several areas, and one of them is in police conduct." First, there is no doubt that this paragraph directly references and points to the alleged conduct by Plaintiff. Blake has therefore, in one fell swoop, labeled Plaintiff as a racist, who engaged in racial profiling, unconstitutionally targeted specific demographics, used excessive force and lacked accountability. All of these claims are false, and Blake's own statement regarding not being targeted as a result of his race in the days immediately following the incident directly contradict what he writes here. He later asserts his plan to use his voice "to speak out to help raise awareness and accountability and make sure that any officer with a discriminatory pattern of behavior gets the training he or she needs." As this is another direct reference to Plaintiff's conduct, the "she" is clearly extraneous here.

44.     On multiple occasions in the book's foreword, Blake speaks to the advantage he enjoys as a celebrity to use the media as a platform to disseminate his views to a large audience. Blake expanded on this theme during his widely-covered publicity junket for the book, as well as

during his many interviews surrounding his testimony in the NYPD Trial Room (Plaintiff had rejected the offer of a loss of ten vacation days as punishment for the incident).

45.    For example, one August 30, 2017 on the Daily Show on Comedy Central, host Trevor Noah interviewed Blake:

BLAKE: I told a lot of my friends what happened. And they joked about it and everything. It was fine. And…No big deal. I told 'em I'm fine, you know? Everything's okay. I'm-I'm all right. You know, my family's healthy. Everything's okay. It's not…you know, not the end of the world. And then they saw the video, and I got people that called me. There were friends of mine that said, "I can't believe that. I got sick to my stomach. I can't believe this actually happens to you."

And it-it was almost like a switch went on, 'cause they see…If someone sees a video of *Terence Crutcher, of, um, uh, Michael Brown, of, um…you know, of Eric Garner, Philando Castile, they see those, they don't have a connection with them. But the people that actually had a connection with me, now this just became real.* [Emphasis added.]

46.    On the September 19, 2017 PBS NewsHour program, the following exchange occurred:

JEFFREY BROWN: I assume that you had never experienced anything like that?

JAMES BLAKE: Not to that extent.

JEFFREY BROWN: Yes.

JAMES BLAKE: I mean, I think almost every person of color at some point in their life has been profiled, whether it be walking into a store or driving your car and you're pulled over for no reason or anything to that extent. So, I have had instances like that, but never physical — physical violence like this.

16

47.    The NewsHour story was promoted on Twitter this way:







48.    Blake was accurate in his statements about his media access, which has, above all else, allowed a former professional tennis player a significant time in the spotlight he otherwise would not have had, and a bully pulpit from which to sell his book and increase his public profile.

49.    Defendant Blake's defamatory statements about Officer Frascatore were circulated to millions of readers and viewers in print, on-line, and through mobile and social media.

50.     Blake has extensively promoted his book, using this false and defamatory narrative to do so.

51.     HarperCollins Publishers, LLC ("HarperCollins") widely promoted Blake's book through banners, video, rich media and other interactive ads on its web and mobile platforms.

52.     When HarperCollins published "Ways of Grace", it knew Blake had no basis for calling or implying Plaintiff is a racist.

53.     Blake and HarperCollins must be held to account and accept full economic and professional responsibility to Plaintiff for the falsehoods in "Ways of Grace" and the failure to retract it and issue a full and complete apology to Plaintiff.

54.     HarperCollins and Blake knew that his defamatory statements about Plaintiff would be viewed by millions of people. HarperCollins also knew that its defamatory statements would be excerpted, reviewed and republished by numerous other media outlets and websites, both because of the horrific conduct ascribed to Plaintiff, and also because such re-publication is a part of HarperCollins' conscious business strategy.

55.     HarperCollins actively promoted "Ways of Grace" on social media, including on its Twitter feed, which has over 957,000 followers, as did Blake, whose Twitter feed has more than 27,000 followers.

56.     Not surprisingly, as detailed above, the widely circulated and heavily promoted "Ways of Grace" and Blake's public statements in its promotion resulted in hatred and hostility toward Plaintiff.

57.     In other examples, New York City Council members rallied for Plaintiff to be fired, and a vocal activist community worked to publicly shame the NYPD into harshly punishing him.

58.     When HarperCollins allowed Blake to use its platform and resources to widely disseminate false narrative that Plaintiff is a racist thug, it not only ripped open old wounds, but also used its loud and far-reaching to inflict new ones which are far worse and painful for Plaintiff.

59.     As a direct and proximate result of Blake's and HarperCollins' intentional and malicious misconduct, Plaintiff suffered anguish, humiliation, embarrassment and damage to his reputation – all of which are continuing in nature and will be suffered in the future.

60.     As a direct and proximate result of Blake's and HarperCollins' intentional and malicious misconduct, they also reaped ill-gotten gains from the sales of "Ways of Grace", which under the unique and special circumstances of this case should be disgorged.

61.     Neither HarperCollins nor Blake should be permitted to profit from a false and defamatory account of Plaintiff's alleged racism, printed with malice and with the knowledge that the identity of the victim of the defamatory publication will drive publicity and, therefore, higher sales.

62.  Plaintiff has retained the undersigned attorneys in this action and is obligated to pay them a reasonable fee for their services.

63.     The release of Plaintiff's confidential personnel information by CCRB employees and/or CATAPANO-FOX was intentional and constituted a violation of Plaintiff's Fifth and Fourteenth Amendment rights and discrimination on the basis of Plaintiff's race under 42 U.S.C. §1981.

64.     The continued use of that information, which was not disavowed, corrected, sequestered or shielded from the public discourse over the next three years by any Defendant (but rather amplified and disseminated) constitutes further racial discrimination and

Constitutional violations under the Fifth and Fourteenth Amendments. Plaintiff was branded a racist while taking normal and appropriate police enforcement action, given the information supervisors and civilian witnesses provided him at the time. All Defendants perpetuated that narrative throughout Plaintiff's public pillorying.

65.    The public comments of the Police Commissioner and other NYPD officials condemning Plaintiff for actions that were approved by supervisors and appropriate under the circumstances, all because Blake was a biracial celebrity, constituted racial discrimination due to the clearly negative effect those comments would have on Plaintiff's employment.

66.    Furthermore, the unwarranted transfer, exclusion from overtime, and other negative employment actions against Plaintiff following the incident with Blake are also proof of a discriminatory intent on behalf of the NYPD.

67.    CCRB's release of Plaintiff's confidential personnel information—and the NYPD's acquiescence to its dissemination—not only led to a public firestorm (despite the lack of substantiation for the CCRB complaints)—but irretrievably tainted any further disciplinary process against Plaintiff. That the Police Commissioner still allowed the agency that leaked Plaintiff's confidential information, leading to that firestorm, to prosecute him for the Blake allegations further tainted the process. CCRB could not be trusted with such an enormous responsibility given its blatant disregard for state law. Plaintiff was therefore deprived of his Constitutional rights to due process.

68.    Defendants' conduct caused Plaintiff to suffer psychological and emotional trauma, and long-lasting damage to his career and good name.  Their actions constituted outrageous and reckless conduct, and demonstrated a callous indifference to and willful disregard of Plaintiff's federal and state protected rights.

20

## FIRST CLAIM FOR RELIEF

## Violation of James Frascatore's Fifth Amendment and Fourteenth Amendment Rights as to Defendants CCRB, TRACY CATAPANO-FOX, and JOHN DOE #1-5

69.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

70.     Defendants CCRB, TRACY CATAPANO-FOX, and JOHN DOE #1-5 knowingly and intentionally violated New York Civil Rights Law §50-a when they released information from Plaintiff's private personnel file to the public.

71.     Defendants knew that the distribution of that information would negatively mold public perception of Plaintiff.

72.     Moreover, defendants knew that the information could be used in the court system and/or the NYPD Trial Room to negatively affect Plaintiff.

73.     While Defendants who released personnel records prior to the Blake incident would not have known of that incident, the negative effect of the release of the information on any incident involving Plaintiff, no matter how minor, was easily and reasonably foreseeable.

74.     It was also easily and reasonable foreseeable that the release of confidential personnel records could negatively affect any court or NYPD disciplinary proceeding against Plaintiff.

75.     After its unlawful release of confidential personnel records, CCRB then continued to investigate Plaintiff, including for the allegations leveled by Blake. The outcome of that investigation was a foregone conclusion, and led to disciplinary charges that a CCRB lawyer then prosecuted.

76.     As City agencies and employees, Defendants CCRB, TRACY CATAPANO-FOX, and JOHN DOE #1-5 intentionally violated Plaintiff's rights to due process as guaranteed by the New York State and United States Constitutions.

77.     Plaintiff suffered injury as a result of Defendants' (CCRB, TRACY CATAPANO-FOX, and JOHN DOE #1-5) conduct.

## SECOND CLAIM FOR RELIEF

### Violation of James Frascatore's Fifth Amendment and Fourteenth Amendment Rights as to Defendant NYPD

78.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

79.     Despite knowledge of the release of Plaintiff's confidential personnel information, defendant NYPD did nothing to disavow, correct, sequester or shield that information from public discourse.

80.     Indeed, the NYPD made public statements demeaning and chastising Plaintiff's actions. Plaintiff was also suspended and then placed on modified duty, blocked from overtime and chart time, refused authority to conduct investigations following Blake's public allegations, and placed on extended "Level 1 Force Monitoring", despite knowing those allegations to be untrue.

81.     Finally, Defendant NYPD allowed CCRB to prosecute Plaintiff in an internal disciplinary matter despite its violation of state law protecting Plaintiff's personnel records.

82.     As such, Defendant NYPD intentionally violated Plaintiff's rights to due process as guaranteed by the New York State and United States Constitutions.

83.     Plaintiff suffered injury as a result of NYPD's conduct.

## THIRD CLAIM FOR RELIEF

### Negligent Hiring, Retention, Training and Supervision as to Defendant CCRB, TRACY CATAPANO-FOX, JOHN DOE #1-5

84.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

85.     Defendant The City of New York and its employees, servants and/or agents acting within the scope of their employment did negligently hire, retain, train and supervise defendants CCRB, TRACY CATAPANO-FOX, and JOHN DOE #1-5, individuals who were unfit for the performance of police duties at the time they released Plaintiff's confidential personnel information.

86.     Plaintiff suffered injuries due to the conduct of defendant The City of New York.

87.     Pursuant to 28 U.S.C. § 1367, this Court has pendant or supplemental jurisdiction to hear and adjudicate such claims.

## FOURTH CLAIM FOR RELIEF

### Discrimination on the Basis of Race as to Defendants CCRB, TRACY CATAPANO-FOX, JOHN DOE #1-5 and NYPD

88.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

89.     CCRB, TRACY CATAPANO-FOX, and JOHN DOE #1-5 publicly released confidential police personnel information about Plaintiff, who is white, concerning complaint by members of minority groups who were the subject of enforcement or arrest by Plaintiff.  The release of that information was intended to assist the complainants in their criminal or civil cases against Plaintiff.

90.     Fueled by the information in the unlawfully released files, Blake, City Council members, activists and members of the public alleged that Plaintiff was a racist. Plaintiff was suspended and then placed on modified duty, blocked from overtime and chart time, refused authority to conduct investigations, and then prosecuted by the CCRB in the NYPD Trial Room, before the NYPD Deputy Commissioner – Trials appointed by the Police Commissioner.

91.     Plaintiff was disciplined in this matter due to the allegations of racism and racial profiling, despite the stated claim that he had violated NYPD procedures and/or committed acts which placed him under the jurisdiction of the CCRB.

92.     Indeed, the entire investigation and prosecution by CCRB was based on the assumption that Plaintiff was a racist, rogue police officer, as CCRB could not point to a single objective fact or expert opinion to bolster its case.

93.     Despite this, NYPD allowed the trial to move forward in its Trial Room.

94.     In acquiescing to the claims of a former tennis star and politically-charged activist outrage, Defendants NYPD and CCRB perpetuated the claim that Plaintiff was a white racist.

95.     As City agencies, NYPD and CCRB are prohibited from discrimination on the basis of race, pursuant to 42 USC §1981.

96.     Defendants CCRB, TRACY CATAPANO-FOX, JOHN DOE #1-5, CCRB and NYPD acting under color of law, intentionally discriminated against Plaintiff due to his race.

97.     Plaintiff suffered injuries as a result of the conduct of Defendants CCRB, TRACY CATAPANO-FOX, JOHN DOE #1-5, CCRB and NYPD.

## FIFTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

98.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

99.     Defendants' unlawful conduct was extreme, outrageous, and utterly intolerable in a civilized community; conduct which exceeded all reasonable bounds of decency.

100.    Defendants' conduct was intended to and did cause severe emotional distress to Plaintiff.

101.    The conduct of Defendants was the direct and proximate cause of injury and damage to Plaintiff and violated his statutory and common law rights as guaranteed by the laws of the Constitution of the State of New York.

102.    As a result of the foregoing, Plaintiff was deprived of due process, was labeled a racist and discriminated against on the basis of his race, was defamed, suffered negative career consequences, was subjected to significant emotional pain and suffering, and was otherwise damaged and injured.

103.    Pursuant to 28 U.S.C. § 1367, this Court has pendant or supplemental jurisdiction to hear and adjudicate such claims.

## SIXTH CLAIM FOR RELIEF

### Negligent Infliction of Emotional Distress

104.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

105.    Defendants' conduct was careless and negligent as to the emotional health of Plaintiff and caused severe emotional distress to Plaintiff.

106.    The acts and conduct of Defendants was the direct and proximate cause of injury and damage to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

107.    As a result of the foregoing, Plaintiff was deprived of due process, was labeled a racist and discriminated against on the basis of his race, was defamed, suffered negative career consequences, was subjected to significant emotional pain and suffering, and was otherwise damaged and injured.

108.    Pursuant to 28 U.S.C. § 1367, this Court has pendant or supplemental jurisdiction to hear and adjudicate such claims.

## **SEVENTH CLAIM FOR RELIEF**

### **Libel, Slander and Defamation**

109.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

110.    HarperCollins and Blake published or caused to be published false and defamatory statements in "Ways of Grace", its promotional materials, and related press appearances and interviews, which did and had the tendency to expose Plaintiff to hatred, contempt, ridicule and/or disgrace.

111.    The defamatory statements in "Ways of Grace", its promotional materials, and related press appearances and interviews are of and concerning Plaintiff, and reasonably understood to be about Plaintiff.

112.    The defamatory statements in "Ways of Grace", its promotional materials, and related press appearances and interviews are false.

113.    HarperCollins and Blake published the defamatory statements in "Ways of Grace", its promotional materials, and related press appearances and interviews knowing that they are false or with reckless disregard for the truth of the statements.

114.    The defamatory statements in "Ways of Grace", its promotional materials, and related press appearances and interviews constitute defamation *per se* because they tended to injure Plaintiff in his trade, business or profession and directly implicated him in a racist use of excessive force against a celebrity, when this could not be further from the truth.

115.    In light of Plaintiff's standing in the community, the nature of the statements made about him, the extent to which those statements were circulated, and the tendency of such statements to injure someone such as Plaintiff, the defamatory statements in "Ways of Grace", its

promotional materials, and related press appearances and interviews have directly and proximately caused Plaintiff to suffer significant damages, including damage to his reputation, humiliation, embarrassment, mental suffering, shame and emotional distress.

116.    These damages are ongoing in nature and will continue to be suffered in the future.

117.    The re-publication of the defamatory statements in other publications, as well as via the dissemination of "Ways of Grace", its promotional materials, and related press appearances and interviews through social media, caused Plaintiff to suffer additional damages, all of which were foreseeable to HarperCollins and Blake.

118.    HarperCollins and Blake published "Ways of Grace", its promotional materials, and related press appearances and interviews with actual knowledge that stories attacking Plaintiff would inflame passions, which drives book sales. Thus, HarperCollins and Blake knowingly and voluntarily exploited and retained a benefit conferred by Plaintiff, in special circumstances particular to this case in which it would be inequitable for HarperCollins or Blake to retain that benefit without paying the value thereof to Plaintiff.

119.    HarperCollins' and Blake's conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Plaintiff, or in blatant disregard of the substantial likelihood of causing him harm, thereby entitling Plaintiff to an award of punitive damages.

120.    As a direct and proximate result of HarperCollins' and Blake's misconduct, Plaintiff is entitled to compensatory, special and punitive damages in an amount to be proven at trial far in excess of $75,000.00.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff pray for relief as follows:

A.      That the jury find and the Court adjudge and decree that Plaintiff shall recover compensatory damages in an amount to be determined at trial against all Defendants, jointly and severally, together with interests and costs, and punitive damages in an amount to be determined at trial against HarperCollins and Blake, jointly and severally.

B.      That the Plaintiff recover the cost of this suit, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

C.      That the Plaintiff have such other and further relief as the Court shall deem just and proper.


Dated:          October 1, 2017
                New York, New York


                                        **BRILL LEGAL GROUP, P.C.**
                                        *ATTORNEYS FOR PLAINTIFF*

                                        By: _____/s/_____
                                        Peter E. Brill (PB0818)
                                        306 Fifth Avenue
                                        Penthouse
                                        New York, NY 10001